John D. FARRIS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 02A03–9909–CR–371.

Court of Appeals of Indiana.

July 20, 2000.

Randall J. Hammond, Deputy Public Defender, Fort Wayne, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Michael Mclaughlin, Deputy At-torney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

VAIDIK, Judge

John D. Farris appeals his conviction for robbery,[1] a class B felony, and his adjudication as a habitual offender[2] after a jury trial. Farris contends that he was denied his due process rights when the State failed to disclose exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Farris also asserts that the bailiff improperly communicated with the jury, resulting in reversible error. Because we conclude that the evidence was not material, the State did not commit a *Brady* violation. Further, we conclude that although the bailiff's communication with the jury was error, the error did not prejudice Farris's rights. Therefore, we affirm.

### Facts and Procedural History

The facts most favorable to the judgment indicate that on the evening of June 22, 1997, Farris and Richard Foreman entered Tom's Super Value Store in Fort Wayne. Upon entering, Farris encountered David May, the store manager, and ordered May to fill a dark gym bag with money. May complied and filled the bag with approximately $3000. Farris and Foreman then fled the store carrying the bag. The two jumped in a car which had been waiting for them and which was driven by Virgil Threatt. Threatt drove Farris and Foreman to a previously determined meeting point where Sonny Woods, Farris's nephew, was waiting in Farris's truck. Farris and Foreman got into the truck, and Woods drove off.

At the time of the robbery, Tonya Davenport, Foreman's girlfriend, was living in a house with Foreman, Farris, Woods, and Foreman's sister, Dorothy. In a statement to police, Davenport indicated that on several occasions in June 1997, she

---

1. IND.CODE § 35–42–5–1.

2. IND.CODE § 35–50–2–8.

observed and heard Farris, Foreman, and Threatt planning the robbery of Tom's Super Value Store. She also indicated that Farris was the leader as he was clearly "calling the shots." Record at 388. On the night of the robbery, Davenport saw Farris, Foreman, Threatt, and Woods leave the house. Later that evening, Farris, Foreman and Woods returned to the home with a dark bag full of money.

In August 1997, Farris was arrested and charged with robbery and as a habitual· offender. Prior to trial, on March 16, 1999, the State deposed Woods. In his sworn deposition, Woods testified that Farris was involved in the robbery. Five days before trial, however, Woods recanted his testimony as to Farris's involvement in the crime on the errata sheet to his deposition. In particular, he alleged that Danny Littlepage, not Farris, committed the robbery. At trial, Threatt and Foreman testified that they assisted Farris in committing the robbery. Woods, however, testified that Farris was not involved in the robbery consistent with his recantation but contrary to testimony he gave at his guilty plea hearing and his deposition. The State, having called Woods as a witness, was surprised by his testimony.

State's witness, Lee Ann Hopkins, also testified that on the evening of June 22, 1997, she was in her car near Tom's Super Value Store and observed two men run out of the store and jump into a car. At the conclusion of Hopkins's testimony, one of the jurors informed the judge that he had a question. The court instructed the juror to wait until the prosecutor had returned to the courtroom before asking his question. Upon the prosecutor's return, the juror asked a question regarding the location of Hopkins's vehicle at the time she witnessed the men leaving the store.

After a brief conference with the prosecutor and defense counsel, the court decided not to instruct the jury or explain the situation. The court learned that the jurors had asked the bailiff whether they were permitted to ask questions of the witnesses. Thus, the court called the bailiff to the stand and questioned him regarding the communication. The bailiff told the court that he informed the jurors that they were permitted to question the witnesses, but that it was not commonly done. The court determined that the bailiff's response was similar to how he would have responded, but instructed the bailiff to forward all questions to the court in the future. Defense counsel stated his concern about any future communication between the bailiff and the jury, but he did not object or request any admonishment of the jury. The State recalled Hopkins and the juror asked his question. Following the jury trial, Farris was convicted of robbery and found to be a habitual offender.

Farris became aware of Woods' errata sheet on April 29, 1999, approximately three weeks after the trial. On June 2, 1999, Farris filed a motion to set aside the jury verdict alleging that the State committed a *Brady* violation in failing to disclose the errata sheet. The court held a hearing on the motion on June 7, 1999, and, finding no *Brady* violation, denied the motion. This appeal now ensues.

## Discussion and Decision

### I. Brady *Violation*

Farris contends that he was denied his due process rights because the State failed to disclose exculpatory evidence. Specifically, Farris asserts that the State suppressed the errata sheet of Sonny Woods' deposition. In the errata sheet, Woods recanted portions of his deposition testimony in which he identified Farris as one of the individuals involved in the crime. Farris claims that by not disclosing the errata sheet to the defense, the State committed a *Brady* violation.

■ In *Brady v. Maryland*, the United States Supreme Court held: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. To prevail on a claim that the prosecution failed to disclose exculpatory evidence, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial. *Conner v. State,* 711 N.E.2d 1238, 1245–46 (Ind.1999) (citations omitted), *reh'g denied, petition for cert. filed* (U.S. Apr. 7, 2000) (No. 99–8989).

■ Here, the evidence was suppressed from the defense by the State. The State had the errata sheet in its possession before trial and did not disclose it to the defendant. It is irrelevant that the prosecutor was unaware the errata sheet existed. Furthermore, the evidence was clearly exculpatory as Woods indicated on the errata sheet that Farris was not involved in the crime. Therefore, the sole issue under *Brady* remains whether the suppressed evidence was material to an issue at trial. Farris alleges it was material, claiming that 1) the statement would have cast Woods' trial testimony "in a much different light," Appellant's Br. at 19, and 2) he could have further deposed the other accomplices to evaluate additional avenues of impeachment.

■ "Evidence is material under *Brady* 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. "A reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Williams v. State,* 714 N.E.2d 644, 649 (Ind.1999) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)), *cert. denied,* — U.S. ——, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000). As the U.S. Supreme Court stated in *Kyles v. Whitley:*

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he

received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

514 U.S. 419, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381). We conclude that the statement here was not material.

First, the substance of the errata sheet was disclosed through Woods' testimony at trial. Woods testified that Farris was not involved thereby recanting his deposition testimony as he had done in the errata sheet. "If the favorable evidence becomes known to the defendant before or during the course of a trial, *Brady* is not implicated." *Williams,* 714 N.E.2d at 649.

■ Second, Farris would not have been permitted to offer the errata sheet itself as a prior consistent statement at trial as it was hearsay. Woods testified at trial that he lied about Farris's involvement in the robbery. The State proceeded to impeach Woods with his prior deposition testimony and guilty plea testimony in which he indicated that Farris was involved in the robbery. Had Farris known about the written statement, he may have attempted to use it to bolster Woods' credibility under the prior consistent statement exception to the hearsay rule. *See* Ind. Evidence Rule 801(d)(1)(B) (providing that statement is not hearsay where declarant testifies at trial and statement is "consistent with the declarant's testimony, offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, and made before the motive to fabricate arose"). However, the statement does not qualify as a prior consistent statement as it was not made before a motive to fabricate arose. Given his familial relationship with Farris, Woods had the motive to lie before he recanted in the errata sheet. Accord-

ingly, the errata sheet would not have been admissible at trial.

▮ Third, there was substantial additional evidence supporting Farris's convictions. Three witnesses testified consistently that Farris was involved in the robbery. Threatt and Foreman, accomplices in the robbery, both testified that Farris was involved in the crime and indicated that Farris was the ring leader of the group. They testified in great detail about the planning of the robbery and the roles of each individual in the robbery itself. Davenport, Foreman's girlfriend, also testified as to Farris's role in the robbery. She indicated that Farris met with the others at home and she heard them planning the robbery. Her boyfriend, Foreman, showed her money obtained during the robbery upon his return home after the crime. All three witnesses' testimony was consistent including their descriptions of the clothing worn and the cars and guns used in the robbery, the conduct of each individual, and the planning of the robbery.

As additional evidence, the State presented the testimony Woods gave at his guilty plea hearing in which he indicated that Farris committed the crime. This testimony could be considered as substantive evidence of guilt. *See* Ind. Evidence Rule 801(d)(1)(A); 13 ROBERT L. MILLER, JR., INDIANA PRACTICE § 801.406, at 515 ("If the declarant testifies and is subject to cross examination concerning the statement, Rule 801(d)(1)(A) provides for admissibility, as *substantive evidence*, of a prior statement that (a) is inconsistent with the declarant's testimony, and (b) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." (citations omitted) (emphasis added)). Hence, the State presented substantial evidence of Farris's involvement including testimony from each of his accomplices.

▮ Farris asserts, however, that had he known of Woods' recantation before

trial, he could have further deposed the other accomplices to investigate additional bases for impeachment. Appellant's Br. at 19. The defendant apparently assumes that the other accomplices were untruthful in their depositions and at trial. However, Farris did not present any evidence to suggest that the accomplices would recant their testimony. Furthermore, the substance of the errata sheet was disclosed at trial in the form of Woods' testimony. Thus, defense counsel could have recalled the witnesses to the stand and examined them or moved for a continuance. Moreover, in an attempt to impeach the witnesses' credibility, defense counsel cross-examined each of the witnesses about their bias against Farris and the plea agreements they received. We fail to see how disclosure of Woods' statement itself would have changed the outcome of the trial. As the evidence is not material, we find no *Brady* violation.

## II. Bailiff/Jury Communication

Farris also asserts that the bailiff improperly communicated with the jury resulting in reversible error. During trial, the jurors asked the bailiff whether they were permitted to ask questions of the witnesses. The bailiff responded that they were permitted to ask questions, but that it was not commonly done. Farris contends that this communication was prejudicial to his right to a fair trial.

▮ When communication between a bailiff and a jury occurs outside of the defendant's presence, there is a presumption of harm to the defendant that the State must rebut to avoid reversal. *Azania v. State*, 730 N.E.2d 646, 654 (Ind. 2000). The State may, however, avoid reversal if no harm or prejudice resulted from the communication. *Driver v. State*, 594 N.E.2d 488, 493 (Ind.Ct.App.1992), *trans. denied.*

▮ While we agree that it was error for the bailiff to communicate with the jury, we conclude that such error was

harmless. Upon learning of the communication between the bailiff and the jury, the court called the bailiff to the stand and the following colloquy occurred:

BAILIFF: The jurors when they got back to the jury room, the first thing they said was I take it we're not allowed to ask questions. And I said, well, no, it's not usually done because a lot of times that testimony will come out later and if you wait you'll hear it, but I said you are not prohibited from asking questions, it's just not done very often. It may be that type of thing and they wanted to start discussing that and I said please you can't talk about anything like this until you've heard all the evidence.

COURT: Okay. In the future, even those kinds of questions you need to defer, although and I don't mean to be critical, you gave them as good or better answer as I could give them, as far as I'm concerned. So anything else?

[DEFENSE COUNSEL]: No, except that is our objection and as you pointed out in the future, the bailiff should not be talking with the jurors about anything except very limited what ever you direct them to do. And that concerns me.

Record at 379–80. We fail to see how this communication prejudiced Farris. The bailiff's response to the jury was similar to instructions the court would have provided. The bailiff did not talk about the facts of the case, further instruct the jury, or discuss substantive legal matters with the jury. *See State v. Winters,* 678 N.E.2d 405, 409 (Ind.App.1997) (noting that "where the *ex parte* communication is only a refusal of a jury's request, the presumption of harm to the defendant was rebutted"). Therefore, any error resulting from the communication between the bailiff and the jury was harmless.

While we find that the error in this case was harmless, we do not mean to say that communication between a bailiff and the jury is appropriate. On the contrary, it is important that trial courts instruct bailiffs to refrain from communicating about the case with jurors. Further, when jurors ask questions of the bailiff, the bailiff's response should be limited to an indication that he will forward the question to the judge. We recognize that bailiffs have numerous opportunities to influence juries. Therefore, courts must be ever cautious to minimize those opportunities consistent with practicality. It is important that juries reach their decisions fairly and impartially. Likewise, it is of equal importance to maintain the integrity of the judicial system and avoid the appearance of partiality in the decision-making process. Consequently, while we find no prejudice here, we will continue to examine closely communication between bailiffs and juries.

Because there was no *Brady* violation and the bailiff's communication with the jury was harmless error, we affirm the judgment of the trial court.

Judgment affirmed.

SULLIVAN, J., and BAILEY, J., concur.